UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
DRC, INC.,                              )
                                        )
              Petitioner,               )
                                        )
       v.                               )      Civil Action No. 10-0003 (PLF)
                                        )
REPUBLIC OF HONDURAS,                   )
                                        )
              Respondent.               )
_____ )


OPINION

        This is an action to enforce an arbitration award rendered in the Republic

of Honduras by Honduran arbitrators under Honduran law.  The underlying dispute arose out of a

construction contract between petitioner, DRC, Inc. ("DRC"), and the Fondo Hondureño de

Inversión Social ("FHIS") — a sub-entity of respondent, the Republic of Honduras ("the

Republic") — under which DRC agreed to construct certain water and wastewater sub-projects

in Honduras, following the devastation wrought by Hurricane Mitch in 1998.  DRC demanded

arbitration with FHIS, and, after approximately twenty-four days of arbitration proceedings, an

award was rendered against FHIS that required FHIS to pay DRC over $51 million.  In this

confirmation action, DRC seeks to enforce the arbitral award against the Republic of Honduras

itself, rather than against FHIS, the award debtor.

        This dispute has given rise to four lawsuits besides this one, affecting the pathway

that the present litigation has followed.  Two are suits brought by DRC against the United States

government — which funded the recovery work done in Honduras — in the Court of Federal

Claims, and a third is a False Claims Act case brought by the United States against DRC in this

Court.  The fourth lawsuit was an action initiated by DRC before a panel of the Supreme Court

of Honduras, in which DRC sought confirmation of the award against FHIS.  Those proceedings

reached their endpoint in August of 2013, when the Supreme Court of Honduras denied DRC's

confirmation effort.  During a portion of the pendency of the Honduran action, this Court stayed

this case.  Since that stay was lifted in June of 2012, the parties have engaged in two rounds of

supplemental briefing, most recently with respect to the potential impact of the Honduran

judgment on the disposition of DRC's petition to confirm.

Currently pending before the Court are four motions:  (1) the Republic's motion

to dismiss DRC's petition to confirm the arbitral award; (2) the Republic's motion to bifurcate

consideration of jurisdictional issues from consideration of merits issues; (3) the Republic's

motion to dismiss the petition with prejudice because of DRC's alleged severe litigation

misconduct; and (4) DRC's motion to strike materials submitted by the Republic in support of its

motion to dismiss for litigation misconduct.  The Republic also has filed a "preliminary

response" to DRC's petition, in which it sets forth further grounds for dismissal of the petition

that are not presented in its initial motion to dismiss.  And the Republic advances yet more

arguments for dismissal in the supplemental briefing filed subsequent to the issuance of the

judgment of the Supreme Court of Honduras.  The Court has carefully considered the parties'

numerous submissions, the relevant legal authorities, and relevant portions of the record.  It

concludes that the Republic enjoys sovereign immunity from suit and that this Court therefore

lacks subject matter jurisdiction over this action.[1]

---

[1]    The papers reviewed in connection with this matter include:  DRC's petition to
confirm arbitral award ("DRC Pet.") [Dkt. No. 1]; the Republic's motion to stay or, in the
alternative, to dismiss petition ("Rep. MTD") [Dkt. No. 11]; the Republic's motion to bifurcate
("Rep. Mot. to Bifurcate") [Dkt. No. 12]; the Republic's preliminary response to petition ("Rep.
Prelim. Resp.") [Dkt. No. 13]; the United States' first statement of interest ("U.S. 1st Stmt. of

## I.  BACKGROUND

This Court has previously set forth the facts of this case in some detail.  See DRC, Inc. v. Rep. of Honduras, 774 F. Supp. 2d 66, 68-71 (D.D.C. 2011), order of stay vacated in 2012 WL 10057466 (D.D.C. June 11, 2012).  It therefore will draw on its earlier exposition of these facts.  Hurricane Mitch struck Central America in 1998 and caused tremendous destruction and dislocation.  In response, the United States Agency for International Development ("USAID") funded reconstruction projects in various Central American countries, including Honduras.  One such project was undertaken in collaboration with FHIS (in English, the "Honduran Social

---

Interest") [Dkt. No. 15]; DRC's opposition to the Republic's motion to stay or, in the alternative, to dismiss petition ("DRC Opp. to MTD") [Dkt. No. 17]; DRC's opposition to the Republic's motion to bifurcate ("DRC Opp. to Mot. to Bifurcate") [Dkt. No. 18]; DRC's reply to the Republic's preliminary response to petition ("DRC Prelim. Resp. Reply") [Dkt. No. 19]; DRC's response to the United States' first statement of interest ("DRC Resp. to U.S. 1st Stmt. of Interest") [Dkt. No. 27]; the Republic's motion to dismiss for severe litigation misconduct ("Rep. MTD for Litig. Misconduct") [Dkt. No. 32]; the Republic's reply to DRC's opposition to motion to stay or dismiss ("Rep. MTD Reply") [Dkt. No. 33]; the Republic's reply to DRC's opposition to motion to bifurcate ("Rep. Mot. to Bifurcate Reply") [Dkt. No. 34]; DRC's motion to strike transcript and other materials submitted by the Republic ("DRC Mot. to Strike") [Dkt. No. 38]; the Republic's opposition to DRC's motion to strike ("Rep. Opp. to Mot. to Strike") [Dkt. No. 45]; the Republic's reply to DRC's opposition to motion to dismiss for severe litigation misconduct ("Rep. MTD for Litig. Misconduct Reply") [Dkt. No. 46]; the United States' second statement of interest ("U.S. 2d Stmt. of Interest") [Dkt. No. 50]; DRC's reply to the Republic's opposition to motion to strike ("DRC Mot. to Strike Reply") [Dkt. No. 51]; the Republic's opposition to DRC's request for sanctions ("Rep. Opp. to Request for Sanctions") [Dkt. No. 60]; DRC's reply to the Republic's opposition to request for sanctions ("DRC Request for Sanctions Reply") [Dkt. No. 62]; DRC's supplemental memorandum in support of confirmation ("DRC Supp. Memo.") [Dkt. No. 104]; the Republic's supplemental memorandum opposing confirmation ("Rep. Supp. Memo.") [Dkt. No. 106]; DRC's supplemental reply in support of confirmation ("DRC Supp. Reply") [Dkt. No. 126]; the United States' third statement of interest ("U.S. 3d Stmt. of Interest") [Dkt. No. 132]; the Republic's supplemental memorandum regarding Honduran judgment ("Rep. Honduran Judg. Supp.") [Dkt. No. 136]; DRC's supplemental opposition regarding Honduran judgment ("DRC Honduran Judg. Opp.") [Dkt. No. 137]; the Republic's supplemental reply regarding Honduran judgment ("Rep. Honduran Judg. Reply") [Dkt. No. 138]; and the United States' fourth statement of interest ("U.S. 4th Stmt. of Interest") [Dkt. No. 142].

Investment Fund"), a sub-entity of the Republic of Honduras.[2]  Funded by a Grant Agreement

executed between the Republic, represented by its Ministry of Finance, and USAID, this project

involved the construction of certain water and wastewater sub-projects in Honduras.  See Special

Objective Grant Agreement Between the Republic of Honduras and the United States of America

for Hurricane Reconstruction Program ("Grant Agreement") [Dkt. No. 24-1].  FHIS solicited

bids for the project, and DRC was eventually selected as the contractor.  DRC, Inc. v. Rep. of

Honduras, 774 F. Supp. 2d at 68.

FHIS and DRC entered into a construction contract on June 21, 2000.  See DRC

Pet., Farmer Aff. Ex. B, Reconstruction Program Construction Contract ("Construction

Contract") [Dkt. No. 1-3].  The Construction Contract between FHIS and DRC required that all

controversies and disputes be governed by the "Construction Contract Liability Clauses."

Id. ¶ 26.  These Clauses provided mechanisms for conflict resolution that included the

submission of disputes to arbitration under the Rules of Conciliation and Arbitration of the

International Chamber of Commerce or the Arbitration Rules of the United Nations Commission

on International Trade Law.  See DRC Pet., Farmer Aff. Ex. C, Mandatory Clauses, Construction

Services Contracts ¶ 9(c) [Dkt. No. 1-3].

---

[2]        This Court previously noted that the parties "appear[ed] to agree that FHIS is in
fact an instrumentality of the Republic of Honduras."  DRC, Inc. v. Rep. of Honduras, 774 F.
Supp. 2d at 68 n.2.  As to DRC — which now claims that FHIS is instead an "organ" of the
Republic — the Court drew this conclusion from the statement in DRC's petition that FHIS is
"an agency or instrumentality of the Republic of Honduras."  DRC Pet. at 2.  But given the
various meanings attached to the term "instrumentality" in the foreign sovereign immunity
context, and the parties' central dispute concerning FHIS's identity as an institution and the
nature of its relationship to the Republic, the Court at this point will refer to FHIS as a "sub-
entity" of the Republic.  Later in this Opinion, the Court takes up the task of resolving the
parties' disagreement on this issue.

In early 2009, DRC demanded arbitration with FHIS.  <u>DRC, Inc. v. Rep. of</u>
<u>Honduras</u>, 774 F. Supp. 2d at 70.  DRC sought damages totaling over $86 million, arising out of
purported breaches of the Construction Contract.  Arbitration proceedings commenced and, as
DRC describes it, "[t]he arbitral tribunal consisted of three Honduran attorneys," and the
arbitration proceedings resulted "in approximately 24 hearing days during which [DRC and
FHIS] presented approximately 29 witnesses including 10 expert witnesses, performed 7 site
inspections in two countries, and introduced approximately 2,165 documents."  <u>Id</u>. (quoting DRC
Opp. to MTD at 8).  The tribunal rendered the arbitral award on September 8, 2009.  The award
required FHIS to pay DRC a combined amount of $51,482,556.90.  <u>Id</u>.

DRC filed its petition to confirm the arbitral award in this Court in 2010.  By that
time, however, four other lawsuits arising out of the same course of events already had been
initiated in a variety of judicial fora.  In June and July of 2004, DRC brought two suits against
the United States in the Court of Federal Claims.  The first of these suits relates directly to the
Construction Contract at issue here, while the second suit relates to an assignment to USAID of a
different contract between DRC and FHIS.  <u>DRC, Inc. v. Rep. of Honduras</u>, 774 F. Supp. 2d at
69.  Then, in September of 2004, the United States filed a civil action in this Court, alleging that
DRC had violated the False Claims Act ("FCA") in connection with its procurement and
performance of the Construction Contract.  <u>Id</u>.  DRC filed a motion to dismiss the FCA action or,
in the alternative, to transfer it to a different venue, but the Court denied both requests.  <u>United</u>
<u>States v. DRC, Inc.</u>, Civil Action No. 04-1608, Dkt. No. 11 (D.D.C. Feb. 17, 2009)
(Memorandum Order).  DRC's subsequent motion for partial summary judgment in the FCA
case was granted in part and denied in part.  <u>United States v. DRC, Inc.</u>, 856 F. Supp. 2d 159
(D.D.C. 2012).  Presently in that case, Judge Barbara Rothstein has set a schedule for the filing

and briefing of dispositive motions, with a jury trial slated to begin on December 1, 2014.  Due

to the pendency and ongoing developments in the FCA case, the two actions in the Court of

Federal Claims remain stayed.  See DRC, Inc. v. United States, No. 04-940 C (Fed. Cl. Aug. 11,

2014) (Order); DRC, Inc. v. United States, No. 04-1124 C (Fed. Cl. Aug. 11, 2014) (Order).[3]

In addition to these three suits brought in United States federal courts, in 2009

DRC filed an action in the Supreme Court of Honduras seeking confirmation of its arbitral

award, and naming FHIS as the respondent.  Because of the pendency of that case, this Court

granted the Republic's motion to stay this action, and ordered the parties to file periodic updates

regarding the status of the Honduran proceedings.  DRC, Inc. v. Rep. of Honduras, 774 F. Supp.

2d at 73-76.  But after the D.C. Circuit's ruling in Belize Social Development Ltd. v.

Government of Belize, 668 F.3d 724 (D.C. Cir. 2012), the Court determined that the indefinite

stay could not be justified, and therefore vacated it.  DRC, Inc. v. Rep. of Honduras, Civil Action

No. 10-0003, 2012 WL 10057466, at *4 (D.D.C. June 11, 2012).  In the same Order, the Court

also adopted DRC's suggestion that the parties provide further briefing regarding the

enforceability of the award against the Republic of Honduras itself, as well as concerning one

other ancillary issue.  Id. at *6.  Shortly after the close of that round of supplemental briefing, the

Supreme Court of Honduras issued its decision in the parallel confirmation proceeding brought

by DRC against FHIS, in which that court denied DRC's confirmation petition.  See Translated

Judgment of Supreme Court of Honduras ("Honduran Judgment") [Dkt. No. 134-1].  The

---

[3]     The United States' involvement in the False Claims Act case has prompted it to
file several statements of interest in this confirmation action.  In its earliest submissions, it had
urged the Court to stay this action pending resolution of the False Claims Act and Court of
Federal Claims cases.  See U.S. 1st Stmt. of Interest at 3.  Following the issuance of the decision
of the Supreme Court of Honduras in DRC's confirmation action against FHIS, however, the
United States now encourages this Court to resolve this confirmation action.  See U.S. 4th Stmt.
of Interest.

issuance of that ruling prompted another round of supplemental briefing here, concerning the impact of the Honduran judgment on DRC's petition in this Court to confirm the arbitral award against the Republic.

Before the Court now are several motions filed at an earlier stage of these proceedings — prior to imposition of the stay — as well as the arguments presented by both parties in the two rounds of supplemental briefing submitted following the lifting of the stay. The Republic, in its initial motion to dismiss DRC's petition, as well as in its "preliminary response" to the petition, advanced numerous grounds for dismissal, most of which remain at least potentially viable following the issuance of the Honduran judgment. Specifically, the Republic had asserted that this Court lacks subject matter jurisdiction over the confirmation action because the Republic enjoys sovereign immunity; that this action presents a non-justiciable political controversy; that the Court lacks personal jurisdiction over the Republic; that DRC has failed to name a necessary party, FHIS, as to which the Court lacks personal jurisdiction; and that the award is not enforceable based on numerous grounds specified in the Inter-American Convention on International Commercial Arbitration. See generally Rep. MTD; Rep. Prelim. Resp. In addition to these various jurisdictional, procedural, and substantive arguments, the Republic also contended that dismissal of the petition is warranted due to DRC's alleged "severe litigation misconduct." See Rep. MTD for Litig. Misconduct. And the Republic further maintained that if this Court were to deny its assertion of sovereign immunity, judicial economy would be served by the Court's declining to address any other issues until the Republic is able to pursue an interlocutory appeal of the jurisdictional ruling. See Rep. Mot. to Bifurcate.

The Republic now argues that, in light of the ruling of the Supreme Court of Honduras — which held that DRC could not enforce the award, based on that court's conclusion

that the arbitral tribunal had not been validly constituted under Honduran law — this Court need

not address "the more complex foreign sovereign immunity issues" presented by the Republic in

its earlier submissions seeking dismissal of the petition.  Rep. Honduran Judg. Supp. at 12.  But

federal courts in this country, as courts of limited jurisdiction, "have an independent

responsibility to ensure that they have subject matter jurisdiction before proceeding to the merits

of a case."  Carson v. U.S. MSPB, 534 F. Supp. 2d 96, 97-98 (D.D.C. 2008) (citing Belhas v.

Ya'alon, 515 F.3d 1279, 1282-83 (D.C. Cir. 2008)).  The Court therefore must address at the

outset the Republic's assertion of its sovereign immunity from suit.  And as explained in the

balance of this Opinion, the Court concludes that because the Republic was not itself a party to

the arbitration agreement between DRC and FHIS, and as the arbitral award was issued solely

against FHIS, a separate and independent entity, this Court lacks jurisdiction to entertain DRC's

petition to confirm the award against the Republic.

## II.  DISCUSSION

### A.  *Foreign Sovereign Immunities Act*

The Foreign Sovereign Immunities Act ("FSIA") provides the sole basis for

obtaining jurisdiction over a foreign state in federal court.  Permanent Mission of India to the

United Nations v. City of New York, 551 U.S. 193, 197 (2007) (citing Argentine Rep. v.

Amerada Hess Shipping Corp., 488 U.S. 428, 439 (1989)).  "A foreign state enjoys sovereign

immunity under the [FSIA] 'unless an international agreement or one of several exceptions in the

statute provides otherwise.'"  Nemariam v. Fed. Dem. Rep. of Ethiopia, 491 F.3d 470, 474 (D.C.

Cir. 2007) (quoting Peterson v. Royal Kingdom of Saudi Arabia, 416 F.3d 83, 86 (D.C. Cir.

2005)).  "In the absence of an applicable exception, the foreign sovereign's immunity is

complete — [t]he district court lacks subject matter jurisdiction over the plaintiff's case."  Id.

(internal quotation marks omitted) (alteration omitted, and alteration in original).  The FSIA

defines "foreign state" broadly, to include not only the sovereign and its political subdivisions,

but also "agenc[ies] or instrumentalit[ies] of a foreign state."  28 U.S.C. § 1603(a).

DRC relies on the so-called "arbitration exception" to the FSIA, which provides

for jurisdiction over efforts to confirm arbitral awards that fall within the scope of international

instruments such as the Inter-American Convention on International Commercial Arbitration (the

"Panama Convention").  See 28 U.S.C. § 1605(a)(6)(B) ("A foreign state shall not be immune

from the jurisdiction of courts of the United States . . . in any case . . . in which the action is

brought [to enforce an arbitration agreement or award that] is or may be governed by a treaty or

other international agreement in force for the United States calling for the recognition and

enforcement of arbitral awards . . . .").[4]  There is no dispute that, had this confirmation action

been brought against FHIS — the award debtor — the Court would have subject matter

---

[4]     Throughout most of this litigation, the parties have been in agreement that the
Panama Convention governs the enforceability of DRC's award.  See, e.g., DRC, Inc. v. Rep. of
Honduras, 774 F. Supp. 2d at 71 (noting that "the parties agree that the Inter-American
Convention applies").  But in supplemental briefing filed after the lifting of the stay, the
Republic for the first time raised the argument that because the arbitral panel concluded that the
award was governed by Honduran administrative rather than commercial law, the Panama
Convention — which governs the enforceability of commercial arbitral awards — does not
apply.  See Rep. Supp. Memo. at 6-8.  The argument, although arriving late in the day, pertains
to the applicability of the FSIA's arbitration exception and therefore implicates the Court's
jurisdiction.  As DRC points out, however, the Republic cites no authority to support its
contention that the applicability of the Panama Convention turns on what body of Honduran law
governed the parties' contractual relationship.  See DRC Supp. Reply at 30-31.  Under the
Federal Arbitration Act, the Panama Convention may govern the enforceability of arbitral
awards arising from "a contract evidencing a transaction involving commerce."  9 U.S.C. § 2;
see also id. §§ 202, 302.  The Court is persuaded that the contract between DRC and FHIS
properly is characterized as commercial in nature, and that the Panama Convention therefore
applies.  Cf. RESTATEMENT (THIRD) OF FOREIGN RELATIONS § 487 cmt. f (1987) ("That a
government is a party to a transaction does not destroy its commercial character; indeed, the fact
that an agreement to arbitrate is in the contract between a government and a private person may
confirm its commercial character . . . .") (addressing the New York Convention).

jurisdiction over the action.[5]  But DRC brings its petition against the Republic itself, which

contends that it is not amenable to suit under the arbitration exception.  This is so, says the

Republic, because it was not a party to the contract containing the agreement to arbitrate; it was

not a participant in the arbitration proceedings; and the arbitral award was not rendered against it,

but, instead, was issued against FHIS, a separate and independent entity.  DRC responds that

because FHIS is either an "organ" of the Republic of Honduras or functions as its agent or alter

ego, the arbitration exception operates to deprive the Republic of sovereign immunity in this

confirmation action.

In First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S.

611 (1983) ("Bancec"), the Supreme Court established that "government instrumentalities

established as juridical entities distinct and independent from their sovereign should normally be

treated as such."  Id. at 626-27.  Instrumentalities of this sort therefore enjoy a "presumption of

separateness" from the sovereign.  See Transamerica Leasing, Inc. v. La Republica de

Venezuela, 200 F.3d 843, 849 (D.C. Cir. 2000).  This presumption can be overcome, however,

either where the instrumentality is "so extensively controlled" by the government that a

"relationship of principal and agent is created," or where "recognition of the instrumentality as

an entity apart from the state 'would work fraud or injustice.'"  Id. at 847-48 (quoting Bancec,

462 U.S. at 629) (some internal quotation marks omitted).  And "[a]lthough the Supreme Court

in Bancec recognized these as exceptions to the rule that a foreign sovereign is not *liable* for the

acts of an instrumentality of the state," the D.C. Circuit has "since held that they serve also as

exceptions to the rule that a foreign sovereign is not *amenable* to suit based upon the acts of such

an instrumentality."  Id. at 848 (citing Foremost-McKesson, Inc. v. Islamic Rep. of Iran, 905

_____

[5]         Whether the Court also could exercise personal jurisdiction over FHIS is a
separate issue, on which the Court need not express a view.

F.2d 438, 446-47 (D.C. Cir. 1990)) (emphases added); see also TMR Energy Ltd. v. State

Property Fund of Ukraine, 411 F.3d 296, 301 (D.C. Cir. 2005) (noting that in Foremost-

McKesson, the court of appeals "held the presumption of independent status detailed in Bancec

also applies to the question of subject matter jurisdiction under the FSIA").

   The presumption of separateness afforded to government instrumentalities — and

the high bar against its disregard — are rooted in principles of comity.  See Bancec, 462 U.S. at

626-27 ("Due respect for the actions taken by foreign sovereigns and for principles of comity

between nations leads us to conclude . . . that government instrumentalities established as

juridical entities distinct and independent from their sovereign should normally be treated as

such." (citation omitted)); Bank of New York v. Yugoimport, 745 F.3d 599, 614 (2d Cir. 2014)

("[T]he [Bancec] Court's concern about the diversion of an instrumentality's assets was not

motivated by a desire to protect instrumentalities for their own sake; the recognition of the

independent status afforded to instrumentalities is derivative of, and incidental to, the underlying

purpose of the presumption, which is to give respect, but not conclusive effect, to foreign

sovereigns' policy decisions.").

   In this case, therefore, two questions must be addressed:  (1) whether FHIS is the

sort of entity to which the presumption of separateness applies; and (2) whether, if it is, sufficient

grounds exist to disregard FHIS's presumptive separateness from the Republic.

### B.  Presumption of Separateness

   DRC maintains that FHIS is an "organ" of the Republic of Honduras, and that it

therefore "is not legally separate from the Republic."  DRC Opp. to MTD at 21; see also DRC

Supp. Memo. at 9-21.[6]  It argues that FHIS's enabling statute, as well as Honduran administrative law more generally, indicate that FHIS is located within the Republic's central administration, as a sub-entity of the Presidency of the Republic.  DRC further maintains that FHIS's core functions are predominantly governmental rather than commercial, and that FHIS lacks the hallmarks of independent instrumentalities identified by the Supreme Court in Bancec.

These characteristic features of independence, some of which purportedly are lacking in FHIS, include:  creation by an enabling law that prescribes the instrumentality's powers and duties; establishment as a separate juridical entity with the capacity to hold property and to sue and be sued; management by a government-selected board; primary responsibility for its own finances; and operation as a distinct economic enterprise that often is not subject to the same administrative requirements that apply to government agencies.  Bancec, 462 U.S. at 624. The Court, having examined FHIS's enabling law, concludes that this enactment endows FHIS with most of the key features of separateness specified by the Supreme Court in Bancec. Although DRC points to several countervailing attributes borne by FHIS, these features ultimately do not persuade the Court to disregard Bancec's central holding — that when a sovereign elects to create an instrumentality with a separate legal personality, its decision normally should be respected by our courts.  See id. at 626-27.

---

[6]      DRC appears to have drawn its chosen terminology — referring to FHIS as an "organ" of the Republic — from the Second Circuit's decision in Compagnie Noga d'Importation et d'Exportation S.A. v. Russian Fed., 361 F.3d 676, 683-90 (2d Cir. 2004), where the court held that the Government of Russia was a "political organ" of the Russian Federation, and not even presumptively an independent instrumentality entitled to a presumption of separateness from the Federation.  But the concurring judge concluded that even with respect to the Government of Russia itself, "Bancec requires that we start with a robust presumption that the Government and the [Russian] Federation are separate juridical entities."  Id. at 693 (Jacobs, J., concurring).

FHIS was established in 1990 by Decree Number 12-90 of the Honduran National Congress, which sets forth the Law of the Honduran Social Investment Fund ("Law of FHIS" or "the Law").[7] This Law provides that the purpose of FHIS is "to promote the improvement of living conditions of marginalized social groups in rural and urban areas, by granting them financing for social or economic development programs and projects." Law of FHIS, Art. 3. Article I of the Law establishes that FHIS "is an entity *desconcentrada* of the Presidency of the Republic, of limited duration, having legal personality, its own patrimony and, within the limits of the present Law, administrative, technical, and financial autonomy."

FHIS's legal personality gives it the capacity to enter into contracts on its own and to sue and be sued in its own name. Specifically, to fulfill its development finance mission, FHIS possesses the power to negotiate and contract for various forms of financing with both national and international entities, as well as to accept financial contributions from those entities. Law of FHIS, Art. 4(a)-(c); see also id. Art. 27 (noting that FHIS's financing of programs and projects shall be regulated by the contracts through which financing was procured from outside sources). FHIS then deploys these funds to finance programs, projects, and works that promote its purpose. Id. Art. 4(ch)-(h). When FHIS provides loans rather than grants to support development programs, it recovers the interest yielded by such loans, which supplements FHIS's capital stock. Id. Art. 25(c). And in conducting these activities, FHIS enters into contracts for public works and for the acquisition of goods. Id. Art. 5. Under Honduran law, then, FHIS

---

[7]     Under Rule 44.1 of the Federal Rules of Civil Procedure, "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." FED. R. CIV. P. 44.1. Both parties have offered affidavits from various individuals, purporting to paraphrase the provisions of the Law of FHIS, but only the Republic has proffered an English translation of the Law. See Dkt. No. 106-2, Ex. 4. DRC does not dispute the accuracy of this translation, except with respect to one word — *desconcentrado* — discussed infra at 17.

possesses a separate juridical identity, which is the defining characteristic of the independent instrumentality.  See Bancec, 462 U.S. at 625, 627.

DRC contends, however, that the Law is silent as to FHIS's capacity to own or sell real property, and it argues that in practice, "all property and resources used by FHIS are owned by the Republic of Honduras."  DRC Opp. to MTD at 32 (citing affidavit of senior engineer for unit of FHIS that managed implementation of the Construction Contract).  It offers as an example the observation that all vehicles used by FHIS are marked as being "Property of the State of Honduras" and bear governmental license plates.  DRC Supp. Memo. at 15-16.  But the Law of FHIS suggests that FHIS holds title to its most vital form of property — its financial assets.  See Law of FHIS, Art. 4(a)-(c); id. Art. 19 (providing that FHIS's personnel expenses "shall be financed from the Fund's resources"); id. Art. 29(b) (requiring, in the event the Fund is discontinued, the transfer of FHIS's "financial resources and other goods to the competent state bodies"); see also id. Art. 1 (granting FHIS its "own patrimony").  FHIS's ownership of its assets implicates a central rationale underlying the presumption of separateness.  As the Supreme Court noted in Bancec, "[f]reely ignoring the separate status of government instrumentalities would result in substantial uncertainty over whether an instrumentality's assets would be diverted to satisfy a claim against the sovereign."  462 U.S. at 626.

DRC further argues that FHIS does not enjoy financial or administrative autonomy from the Republic.  DRC Opp. to MTD at 31.[8]  As already noted, the Law of FHIS expressly provides that "within the limits of the [] Law, [FHIS has] administrative, technical, and financial autonomy."  Law of FHIS, Art. 1.  One such limitation emphasized by DRC is the fact

_____

[8]      In its supplemental reply concerning the enforceability of the award, DRC for the first time explicitly raises the argument that the Bancec presumption applies only to entities established as state-owned corporations.  DRC Supp. Reply at 14.  Bancec perhaps could be read to imply such a restriction, but DRC points to no case in which a court has so limited it.

that, although FHIS's Internal Audit "control[s] the Fund's budget and its financial operations,"

Law of FHIS, Art. 20, the Internal Auditor is "appointed directly by the President of the

Republic, and answerable to [FHIS's governing council, over which the President presides]"; and

the Internal Auditor's duties are conducted "without prejudice to the supervisory activities of the

Comptroller General of the Republic."  Law of FHIS, Art. 21.  This Court is not persuaded,

however, that the government's maintenance of some degree of financial oversight transforms a

juridically separate instrumentality into an organ of the state.  Nor is it consequential that much

or even most of FHIS's economic resources are allocated to it by the Republic.  See DRC Supp.

Memo. at 15; DRC Opp. to MTD at 27-28.  Appropriations from a sovereign to its

instrumentality constitute a "normal aspect" of their relations, "not an instance of 'day-to-day'

involvement in the affairs of the [instrumentality]."  Transamerica Leasing, Inc. v. La Republica

de Venezuela, 200 F.3d at 852 (citing Bancec, 462 U.S. at 624); see also Bancec, 462 U.S. at 614

(noting that the Cuban government supplied all of its instrumentality's capital, and that all of the

instrumentality's profits were received by Cuba's General Treasury).

        With respect to the degree of FHIS's administrative autonomy, DRC highlights

several structural features of FHIS that do raise questions regarding the independence of its

operations, and which cast some doubt on FHIS's identity as an entity purportedly separate from

the government.  In the Court's view, however, these features do not countervail the legal

independence afforded to FHIS by its enabling law, nor the functional independence FHIS has

been given to conduct its daily operations.  It is true that the President of the Republic presides

over FHIS's Supreme Council of Administration, which essentially functions as FHIS's board of

directors.  And the Council has responsibility for approving "the general policy and guidelines

that [] govern the Fund's activities," and for authorizing FHIS's entrance into negotiations

relating to financing agreements.  Law of FHIS, Art. 8-10.  The Council also includes among its membership the President of the National Congress and three Ministers of State, in addition to representatives from the business and community organizing sectors.  Id. Art 8.  Furthermore, FHIS's Executive Director bears the rank of Minister of State.  Danzilo Aff. ¶¶ 5-7 & Ex. B [Dkt. Nos. 23 and 23-1]; see also Construction Contract at 7 (indicating that FHIS Executive Director holds the rank of Minister).[9]  The Executive Director is appointed by the President, who holds authority to remove the Executive Director.  Law of FHIS, Art 13.  Finally, FHIS's enabling law establishes it as "an entity . . . of the Presidency of the Republic," id. Art. 1, and the contract between FHIS and DRC defined FHIS as a "branch of the Presidency of the Republic." Construction Contract at 1.

The state-owned entity in Bancec itself also bore some of these same attributes. The Supreme Court nevertheless began with the presumption that, notwithstanding these features, Cuba's decision to create the institution as a separate juridical entity warranted a strong measure of respect.  The Banco Para el Comercio Exterior de Cuba ("Bancec") had been established by the Cuban government as "[a]n official autonomous credit institution for foreign trade . . . with full juridical capacity . . . of its own," and it was "empowered to act as the Cuban Government's exclusive agent in foreign trade."  Bancec, 462 U.S. at 613-14 (alteration and omissions in original).  Bancec's Governing Board "consist[ed] of delegates from Cuban governmental ministries," and Bancec's president, Che Guevara, also was a Minister of State, in addition to being the President of Cuba's central bank.  Id. at 614.  Nonetheless, and out of

---

[9]     Although the Executive Director of FHIS bears an equivalent rank to the three Ministers who sit on the Council, those Ministers are primarily tasked with running Ministries of the Republic, whereas the Executive Director's sole responsibility lies in managing the operations of FHIS.  See Law of FHIS, Art. 8.

respect for a sovereign nation, the Supreme Court presumptively recognized Bancec's separate juridical status.[10]  Similarly in the case of FHIS, certain elements of its composition appear to link it to the Republic in meaningful ways.  But these attributes do not counteract the unequivocal statement in FHIS's enabling law establishing its independent juridical identity, which is reinforced by FHIS's independence in conducting its daily operations, subject to some degree of oversight by the government and within the confines of the general policies established by FHIS's Supreme Council of Administration.

DRC next draws on sources of Honduran law other than the Law of FHIS itself in an effort to demonstrate that FHIS is located within the Republic's "Centralized Administration," rather than in its "decentralized" administration.  DRC Supp. Memo. at 14-15; DRC Opp. to MTD at 23-26, 30-31.  The Republic — which, like DRC, cites to the opinions of various affiants purporting to be familiar with the legal structure of the Honduran administrative state — counters that FHIS is in fact a part of the decentralized sector of the government.  Rep. Supp. Memo. at 21-26; Rep. MTD Reply at 7-12.  In particular, the parties dispute the proper translation into English of the word "*desconcentrado*," which the Honduran National Congress employed to describe FHIS in the legislative act that created the entity.  See Law of FHIS, Art. 1. The Republic translates this term to mean "decentralized," while DRC claims that there exists an important distinction — obscured by the Republic — between the words "*desconcentrado*" and "*decentralizado*."  See DRC Supp. Memo. at 15; DRC Opp. to MTD at 24 n.6.  According to DRC, the term "*desconcentrado*" means "nonconcentrated" rather than "decentralized," and refers only to entities located within the Centralized Administration.

---

[10]      The Court ultimately held that this presumptive separateness should be disregarded, but only because the failure to do so would have been inequitable, given the facts of that case.  See Bancec, 462 U.S. at 630-33.

The Court does not find the parties' extensive discussion of Honduran administrative law to be particularly helpful in the present circumstances.  FHIS's enabling law itself is the most pertinent Honduran authority in this context.  That Law, as explained above, provides that FHIS possesses independent legal personality, which, under Bancec, warrants a presumption of respect in our courts.  Resolving the parties' dueling interpretations of various Honduran authorities, from which each party draws competing inferences regarding FHIS's identity and placement within the administrative structure of the Republic, would not alter this essential conclusion.

Finally, DRC argues that FHIS's "core functions" are governmental, not commercial, thus rendering it an "organ" of the Republic.  DRC Supp. Memo. at 11-13; DRC Opp. to MTD at 29.  DRC relies on the D.C. Circuit's decision in Transaero, Inc. v. La Fuerza Aerea Bolivia, 30 F.3d 148 (D.C. Cir. 1994), which, it contends, controls the question "whether a foreign entity is an independent instrumentality or a foreign sovereign's organ."  DRC Supp. Memo. at 11.  In Transaero, the court of appeals was faced with construing the language of the FSIA's provisions relating to service of process on foreign defendants.  The FSIA's requirements for effecting service differ depending on whether the defendant is "a foreign state or political subdivision of a foreign state," see 28 U.S.C. § 1608(a), or "an agency or instrumentality of a foreign state."  See 28 U.S.C. § 1608(b).  In Transaero, the plaintiff corporation had served the Bolivian Air Force according to the procedures set forth in Section 1608(b), but the D.C. Circuit held that it should have done so according to the requirements for service under Section 1608(a), as the Air Force was to be "considered as the 'foreign state' itself, rather than a separate 'agency or instrumentality' of the state."  30 F.3d at 153-54.  To make this determination, the court of appeals adopted a "categorical approach" focused on "whether the core functions of the foreign

entity are predominantly governmental or commercial." Id. at 151.  Here, DRC contends that

"FHIS engages in quintessentially governmental activities," which include "fulfill[ing] societal

needs [and] promot[ing] the public welfare," without any profit motive.  DRC Supp. Memo. at

12.  It further argues that "FHIS only participates in commercial activities to fulfill its

'predominantly governmental' social-development mission."  Id. at 13.

   The problem with DRC's argument is that the D.C. Circuit subsequently has

confined the applicability of Transaero's core functions test to construction of the text of the

FSIA itself.  See TMR Energy Ltd. v. State Property Fund of Ukraine, 411 F.3d at 301 ("[A]

different analysis is indicated where the issue is not service of process under the FSIA" or "the

meaning of the statutory terms 'foreign state' and 'agency or instrumentality.'").  The court in

TMR Energy was confronted with the question whether the State Property Fund of Ukraine

enjoyed due process protections accorded to "persons" under the Fifth Amendment, which would

have entitled it to argue that it lacked the minimum contacts necessary for personal jurisdiction.

Id. at 299-300.  To resolve this question, the court of appeals decided against applying the core

functions approach of Transaero and instead concluded that the Supreme Court's decision in

Bancec should guide its way.  Id. at 301.  And the court noted that the Bancec approach entailed

"the same analysis" as that employed by the D.C. Circuit to resolve issues of subject matter

jurisdiction under the FSIA.  Id. (citing Foremost-McKesson, Inc. v. Islamic Rep. of Iran, 905

F.2d at 446-47).  The core functions test therefore is not applicable to this case, and, for the

reasons discussed, the Court concludes that under Bancec, FHIS's establishment as a juridically

independent entity entitles it to a presumption of separateness from the Republic for purposes of determining whether the Court has subject matter jurisdiction.[11]

## C.  Has the Presumption of FHIS's Separateness Been Overcome?

The presumption of separateness notwithstanding, the Republic is amenable to suit in this Court if that presumption is overcome on either of two grounds:  (1) the Republic dominated FHIS or otherwise made FHIS its agent; or (2) the Court's failure to disregard the presumption would work a fraud or injustice.  See Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 847-48.  Where the assertion of a principal-agent relationship forms the purported basis for a court's exercise of jurisdiction over a foreign sovereign, it is the plaintiff or petitioner who "bears the burden of asserting facts sufficient to withstand a motion to dismiss regarding the agency relationship."  GSS Group Ltd. v. Rep. of Liberia, Civil Action No. 12-0332, 2014 WL 930790, at *8 (D.D.C. Mar. 11, 2014) (quoting Foremost-McKesson, Inc. v. Islamic Rep. of Iran, 905 F.2d at 447) (internal quotation marks omitted); see also Bank of New York v. Yugoimport, 745 F.3d at 614 ("This burden evinces the measure of respect due foreign sovereigns.").

---

[11]     DRC also cites another point from Transaero, where the court of appeals appeared to endorse reasoning suggested by the United States in an amicus brief, observing that "any nation may well find it convenient (as does ours) to give powers of contract and litigation to entities that on any reasonable view must count as part of the state itself."  Transaero, Inc. v. La Fuerza Aerea Bolivia, 30 F.3d at 152.  This point certainly stands to reason; but, crucially, the court in Transaero applied it only as a means of understanding congressional intent as expressed in the text of the FSIA.  See id.  The Supreme Court's decision in Bancec was not mentioned by the D.C. Circuit in its opinion.  Whether the logic of this proposition requires reconciliation with the great weight afforded under Bancec to a sovereign's choice to endow an entity with independent legal personality — and, if so, how to reconcile these themes — are questions that this Court does not now have occasion to undertake.

### 1.  Agency Exception

The first ground for disregarding an instrumentality's presumptive separateness from its sovereign — "the agency exception" — can be founded on either of two different concepts:  control or apparent authority.  Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 848-50.[12]  And the concept of control is itself "relevant in two distinct contexts."  Id. at 848.  "First, control is relevant when it significantly exceeds the normal supervisory control exercised by any corporate parent over its subsidiary and, indeed, amounts to complete domination of the subsidiary," such that the sovereign and its instrumentality are "not meaningfully distinct entities; they act as one."  Id.  "Second, control is relevant when the sovereign exercises its control in such a way as to make the instrumentality its agent; in that case control renders the sovereign amenable to suit under ordinary agency principles."  Id. at 849.

With respect to the first context in which control is relevant, DRC advances arguments, under what it labels an alter ego theory, which appear aimed at demonstrating an excessive degree of state control that could amount to "complete domination" of FHIS by the Republic.  It maintains, for example, that the Republic exercised day-to-day control over FHIS's conduct with respect to the Construction Contract.  DRC Opp. to MTD at 33-35.  But it cites a list of day-to-day activities that in fact were conducted by the Directorate of Major Infrastructure ("DMI"), the unit within FHIS that bore managerial responsibility for DRC's work.  See id. at 34 (quoting Fortin Aff. ¶ 6 [Dkt. No. 21]).  DRC's argument reduces to its reliance on a statement in

---

[12]     The court in Transamerica expressed "doubt, however, that a case of merely apparent authority falls within the agency exception — an exception limited by its terms to situations in which the instrumentality 'is so extensively controlled by [the sovereign] that a relationship of principal and agent is created.'"  Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 850 (quoting Bancec, 462 U.S. at 629) (alteration in original).  But apparent authority may still be relevant "under the exception for fraud and injustice."  Id.  Accordingly, the Court addresses the concept of apparent authority infra at 27-28, in its discussion of DRC's arguments under the fraud and injustice exception.

the Grant Agreement between the Republic and USAID that DMI's actions would be considered

to be actions taken by or on behalf of the Republic.  See id. at 35 ("By virtue of [DMI's] day-to-

day control over the Contract, the Republic had day-to-day control over the Contract.").

Specifically, the provision of the Grant Agreement on which DRC relies stated that "the FHIS

Executing Unit [that is, DMI] . . . constitutes, and will be considered by the [Republic] and FHIS

to be, a unit of the Government of Honduras and, accordingly, all actions taken by members of

the FHIS Executing Unit in implementation of the [reconstruction work] will be considered to be

actions taken by or on behalf of the Republic and FHIS."  Grant Agreement § 6.3.  This

provision does not evince actual control of FHIS by the Republic; rather, it indicates the

Republic's intent that DMI act as and for the government in executing its duties under the

Construction Contract.  This intent certainly is relevant to the question whether, under ordinary

principles of agency law, the Republic meant to designate DMI (and, by extension, FHIS) as its

agent.  See infra at 23.  But it cannot support a finding that the Republic exerted complete

domination over FHIS or that FHIS was its alter ego.  See Transamerica Leasing, Inc. v. La

Republica de Venezuela, 200 F.3d at 848.

      DRC also asserts that the "Honduran President's power to control FHIS and

override its executives is more than sufficient to satisfy the alter-ego exception."  DRC Supp.

Memo. at 24 n.35.  But some level of state control over an instrumentality's governing board

does not automatically mean that the sovereign exercises "complete domination" over the

instrumentality.  See Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 851

(citing Foremost-McKesson, Inc. v. Islamic Rep. of Iran, 905 F.2d 448).  Notwithstanding the

President's presiding role on FHIS's Supreme Council of Administration, FHIS appears to enjoy

significant autonomy in the conduct of its daily operations.  See id. at 848 (complete domination

results where a sovereign's control is so excessive that "the sovereign and the instrumentality are in those circumstances not meaningfully distinct entities; they act as one").  DRC therefore fails on its "complete domination" or "alter ego" theory.

       The D.C. Circuit in <u>Transamerica</u> explained that the <u>Bancec</u> presumption also can be overcome where the state's control over its instrumentality renders the sovereign "amenable to suit under ordinary agency principles."  <u>Transamerica Leasing, Inc. v. La Republica de Venezuela</u>, 200 F.3d at 849.  The court recognized, however, that "[t]he question [of how much control is required before parent and subsidiary may be deemed principal and agent] defies resolution by mechanical formula[e]."  <u>Id</u>. (final alteration in original).  Nevertheless, it could "confidently state" that "the relationship of principal and agent does not obtain unless [1] the parent has manifested its desire for the subsidiary to act upon the parent's behalf, [2] the subsidiary has consented so to act, [3] the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and [4] the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors."  <u>Id</u>.

       Even assuming that the first three elements of the agency standard set out in <u>Transamerica</u> have been satisfied by the showing DRC has made, DRC founders on the fourth, which requires a demonstration that the Republic actually exercised the requisite degree and manner of control over FHIS.  Although DRC argues that a parent need not actually exercise control over its agent so long as it maintains the right to do so — relying on a comment to Section 1.01 of the Third Restatement of the Law of Agency, <u>see</u> DRC Supp. Reply at 10 (citing RESTATEMENT (THIRD) OF THE LAW OF AGENCY § 1.01 cmt. c (2006)) — the controlling articulation of agency law in this context is that provided by the D.C. Circuit in <u>Transamerica</u>,

where the court stated that "the relationship of principal and agent does not obtain unless . . . the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, *and the parent exercises its control*" in a sufficiently direct manner.  Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 849 (emphasis added); see also In re Kaiser Group Int'l, Inc., 730 F. Supp. 2d 247, 252 (D.D.C. 2010) (citing the agency standard from Transamerica, and stating that "[e]ven if the parent has the right to control the subsidiary, it must actually exercise that control").  This requirement of actual exercise of control is unsurprising in the sovereign immunity context, given that the agency exception to the presumption of separateness is "limited by its terms to situations in which the instrumentality 'is so extensively controlled by [the sovereign] that a relationship of principal and agent is created.'"  Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 850 (quoting Bancec, 462 U.S. at 629).

The fact that the President of the Republic presides over FHIS's Supreme Council of Administration and appoints the Executive Director of FHIS and its Internal Auditor — even in conjunction with the fact that three Ministers of State also serve on the Council — does not demonstrate the exercise of actual control necessary to render FHIS the agent of the Republic under Bancec and Transamerica.  See Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 851-52.  As for other indicia of control that might militate toward an opposite conclusion, DRC contends that the Republic exercised "hands-on involvement in FHIS's operations" with respect to the Construction Contract.  It first notes that in an Implementation Letter issued by USAID as a supplement to the Grant Agreement, it was provided that the Republic's Ministry of Finance bore responsibility for "[m]onitoring [FHIS's] overall compliance with the procedures set forth in [the Implementation Letter]."  Implementation

24

Letter, Section I.A.1 [Dkt. No. 24-4].  The Letter delineated a number of FHIS's obligations with

respect to its implementation work under the Grant Agreement, including, for example,

compliance with budgetary and contracting guidelines, as well as the performance of

environmental reviews and annual audits.  See id. at Parts II-IV.  But the provision for some

degree of monitoring by the government of FHIS's compliance with USAID policies — to which

the United States' funding for the reconstruction work was tied — does not indicate that the

government exercised the sort of managerial control needed to overcome FHIS's presumptive

separateness.  See Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 849-53.

Under the Grant Agreement and the Implementation Letter, FHIS, as the "Contracting Agency,"

undertook numerous obligations to USAID, as Grantor.  The Republic, as Grantee, also bore an

obligation to USAID to ensure that those conditions were satisfied.  This framework for

oversight is not sufficient to demonstrate the exertion of the requisite "extensive control" by the

Republic over FHIS.

       DRC also cites the government's purported financial control over FHIS, including

its assumption of FHIS's debts — including the award debt at issue in this case.  DRC Supp.

Memo. at 23.  But the financial links between FHIS and the Republic do not appear to be

materially different than those that existed between Venezuela and its instrumentality in

Transamerica, which included Venezuela's appropriation of funds to the instrumentality to cover

its debts.  See Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 852.  The

court of appeals there emphasized that "the infusion of state capital to cover [the

instrumentality's] losses was a normal aspect of the relation" between it and the sovereign.  Id.

And for this point the D.C. Circuit drew on Bancec, as the Supreme Court had expressly noted

that a "'typical government instrumentality' has primary responsibility for its own finances

'[e]xcept for appropriations to provide capital or to cover losses.'"  Id. (quoting Bancec, 462 U.S. at 624).

As DRC acknowledges, the D.C. Circuit's decision in Transamerica "is controlling."  DRC Supp. Reply at 10.  The court of appeals in that case explicated how to apply the agency exception set forth in Bancec:  this exception may rest either on complete domination or ordinary agency principles, but in either case a sufficient degree of control must be demonstrated.  See Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 848-53.  DRC has failed to make a showing sufficient to satisfy this exception for overcoming FHIS's presumptive separateness from the Republic.

## 2. Fraud or Injustice Exception

The second ground for overcoming the presumption of separateness is where failure to do so would work a fraud or injustice.  In Bancec, the Supreme Court applied this principle to hold that the respondent's separate juridical identity should be disregarded.  The case had been initiated by Bancec — the Cuban instrumentality — to collect on a letter of credit issued by First National City Bank ("Citibank").  Bancec, 462 U.S. at 613-14.  Citibank counterclaimed and sought a setoff for the value of assets that had been seized by the Cuban government as part of a nationalization program.  Id.  The Supreme Court held that the presumption of independent status otherwise enjoyed by Bancec was overcome where it was clear that "the Cuban Government [itself] could not bring suit in a United States court without also subjecting itself to its adversary's counterclaim," and where, due to the fact that "Bancec was dissolved even before Citibank filed its answer," "the Cuban Government and [its central bank] . . . would be the only beneficiaries of any recovery."  Id. at 630-32.  The Court explained that its decision resulted from "the application of internationally recognized equitable principles

to avoid the injustice that would result from permitting a foreign state to reap the benefits of our courts while avoiding the obligations of international law."  Id. at 633.

Adequate grounds for invoking the exception for fraud and injustice may exist where a foreign sovereign intentionally seeks to gain a benefit while using the legally separate status of its instrumentality as a shield to guard against concomitant costs or risks, see Bancec, 462 U.S. at 630-33; where a sovereign otherwise unjustly enriches itself through the instrumentality, see Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 854; or where a sovereign uses its instrumentality to defeat a statutory policy.  See id.  In addition, fraud or injustice may also be apparent where an instrumentality has been cloaked with the apparent authority of the sovereign, and the complaining party reasonably relies upon that manifestation of authority.  Id. at 850.  These grounds, however, are not exclusive; the Supreme Court in Bancec made clear that its decision announced "no mechanical formula for determining the circumstances under which the normally separate juridical status of a government instrumentality is to be disregarded," but, rather, was "the product of the application of internationally recognized equitable principles to avoid . . . injustice."  Bancec, 462 U.S. at 633.

DRC asserts that because it reasonably believed that FHIS possessed the authority of the Republic, it therefore would be inequitable to permit the Republic to avoid responsibility for payment of the arbitral award.  DRC Supp. Memo. at 7-8, 24-26; DRC Supp. Reply at 11-13. But DRC does not explain how its purported reliance on FHIS's authority to act for the Republic was essential to its entering into the Construction Contract.  See Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 850 (plaintiff asserting theory of apparent authority "would have to show that it reasonably relied upon a manifestation by the sovereign to that effect").  Indeed, DRC's effort to confirm the award against FHIS in the Honduran courts

27

indicates an understanding that FHIS itself was legally liable to DRC and capable of satisfying the arbitral award rendered against it.  As to this point, DRC emphasizes that, in actuality, FHIS's liabilities become liabilities of the Republic.  DRC Supp. Memo. at 28.  But as the Court already has noted, a sovereign's payment of its instrumentality's debts is not a sufficient basis for disregarding the instrumentality's separate legal identity.  Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 852 (citing Bancec, 462 U.S. at 624).[13]

       To be sure, FHIS operated as an integral element of a program through which the Republic endeavored to serve the national interests of Honduras by the implementation of hurricane reconstruction work.  That a sovereign such as the Republic of Honduras may derive benefits from a contractual relationship between its instrumentality and a firm such as DRC, yet still avoid amenability to suit in United States courts in an action stemming from that relationship, is a necessary corollary of Bancec's holding.  See GSS Group Ltd. v. Rep. of Liberia, 2014 WL 930790, at *10 (noting that "governments establish [independent] instrumentalities . . . to achieve the economic goals of the state" (citing Bancec, 462 U.S. at 624-25)).  The Supreme Court's decision in Bancec, rooted in comity, requires such an outcome in the present case.

---

[13]    DRC suggests several other grounds on which injustice purportedly rests, see DRC Supp. Memo. at 25-28, but the Court remains unpersuaded that this case presents facts under which equitable principles would mandate disregard of the strong presumption of separateness afforded to FHIS.

III.  CONCLUSION

For the foregoing reasons, the Court concludes that respondent Republic of Honduras enjoys sovereign immunity with respect to DRC's petition to confirm the arbitral award, and the Court therefore lacks subject matter jurisdiction over this action.  Accordingly, the Court will grant the Republic's motion to dismiss DRC's petition, and will deny as moot the several other pending motions.  An appropriate final Order accompanies this Opinion.

SO ORDERED.


/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  October  23, 2014